[Crim. Nos. 9218, 9219. Second Dist., Div. Two. Feb. 9, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. ROBERT S. POLLOCK, Defendant and Appellant.

Elinor Chandler for Defendant and Appellant.

Stanley Mosk and Thomas C. Lynch, Attorneys General, William E. James, Assistant Attorney General, and Herbert Davis, Deputy Attorney General, for Plaintiff and Respondent.

HERNDON, J.—Defendant appeals from the judgment entered against him following a nonjury trial resulting in his conviction of the crime of grand theft, four counts, in violation of section 487, subdivision 1, of the Penal Code. He also appeals from the order determining that, as the result of the instant conviction, he had violated the terms of the probation theretofore granted him in a prior proceeding and the judgment entered therein following said revocation.

No point would be served by a lengthy recital of the evidence (which portrays an all-too-prevalent and distressing scene), since it is apparent that the judgment must be reversed and the cause remanded for a new trial and redetermination in the light of the recent decision of our Supreme Court in *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. Suffice it to say that the evidence demonstrates beyond any reasonable doubt that appellant perpetrated a bunco scheme whereby he defrauded one Benjamin Kaplan of several thousand dollars.

However, this matter was tried under a stipulation that the People's case in chief might be submitted upon the transcript of the testimony taken at the preliminary hearing. No further testimony was introduced on behalf of the People. Therefore, the testimony of the appellant regarding the alleged deprivation of his right to counsel is undisputed in the record before us. During the preliminary examination, Officer Dwight Stevens, one of the arresting officers, testified to statements made to him by appellant following his arrest that were tantamount to a confession. That testimony included the following:

"Q. Please tell us what he told you about this case. A. I had three preliminary conversations with the defendant at the time of his arrest en route to the police station and in the police station on March the 11th of this year. Then on March the 13th of this year, en route to the Hall of Justice from Wilshire Station in a police vehicle, in the presence of the defendant, myself, and my partner, Sergeant Sullivan, I told the defendant that we had checked the handwriting on these receipts, where it was initialed, 'A. L. G.,' and, 'R. S. Lewis,' and had determined that this was his handwriting; that we had checked the license numbers on all of the vehicles listed; that the license numbers did not belong to those vehicles; and in some cases the license numbers actually did not even exist.

"I asked him if he'd tell us about it. He stated, well, actually all of the license numbers and the vehicles listed were

phony, that they actually did not exist, that he actually did not have any connection with the Public Finance Company and there was no such person as Allen Gregory. He stated that this actually wasn't his deal alone; that Ben Kaplan had actually been in on the deal with him to beat the old man, as he referred to him, Sam, out of this money. So he said, 'Actually, Ben is in on this deal with me.'

"I at that time told him that we had checked with Public Finance Company ourselves, that we had determined that Ben had actually checked with Public Finance to see if the cars had been sold by them and that we didn't believe that Ben was involved in it; and asked him why he was trying to implicate Ben. At this time he stated, 'Well, no, Ben is not involved in it.' He said, 'I don't know why I do these things. I have been to a psychiatrist or at least to a doctor seeking some type of psychiatric help.' That was about the substance of the conversation." Concerning these statements, appellant testified as follows:

"Q. Well, after you were arrested, you were questioned by Officer Dwight Stevens here, were you not? A. The officer asked me several times about the details of this deal, and I told him that I'd have to see my attorney when he first picked me up. And he came back the following day into the jail there on Pico and got me upset again and asked me the same questions again. I said to him, 'There's nothing I can tell you. I will have to see my attorney first.' He said to me, well, the attorney isn't going to spend the time in jail for me. 'You better tell me what it is, what it is all about.' I said, 'I can't tell you anything,' which I didn't, and, of course, it made him kind of mad, and he said to me, 'I am going to throw the book at you for this; you might as well tell me.' "

As indicated, no evidence was introduced on behalf of the People to rebut these statements, so that, taken at face value, they appear to exclude the possibility that appellant was advised of his right to remain silent and to have the aid of counsel. Understandably, neither the prosecution nor the trial court deemed it necessary to explore this issue in detail, for there was little, if anything, therein contained tending to establish that appellant's statements to the police were involuntary in the traditional sense of that term. However, in *People* v. *Dorado, supra,* 62 Cal.2d 338, at pp. 353-354, the following unequivocal declaration of the law was made:

"We conclude, then, that defendant's confession could not properly be introduced into evidence because (1) the investi-

gation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements, (4) the authorities had not effectively informed defendant of his right to counsel or of his absolute right to remain silent, and no evidence establishes that he had waived these rights.''

The fact that the evidence apart from appellant's statements to the police almost conclusively established his guilt cannot alter this result. In *People* v. *Dorado, supra,* 62 Cal. 2d 338, at p. 356, it is declared:

''Finally, we cannot dispose of the introduction of the illegally obtained confession upon the ground that it constituted merely harmless error. Although under some circumstances the introduction into evidence of statements obtained from a defendant during police interrogation in violation of his right to counsel and his right to remain silent may constitute harmless error, we are convinced that the error is necessarily prejudical when the statements are confessions.''

The judgment and the order under review are reversed for further proceedings not inconsistent with this opinion.

Roth, P. J., and Kincaid, J. pro tem.,* concurred.

Respondent's petition for a hearing by the Supreme Court was denied April 6, 1965.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.